UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

STEPHEN M. COLE, et al.,

      Plaintiffs,

v.

JACKSON NATIONAL LIFE
INSURANCE CO.,

      Defendant.

_____/

Case No. 1:11-CV-221

HON. GORDON J. QUIST

**OPINION**

This case is very similar, but not identical, to another case before this Court: *Ivie v. Diversified Lending Group, Inc.*, Case No. 1:09-CV-751. In *Ivie*, this Court dismissed some of the plaintiff's claims and allowed the remaining to go forward. The counts that were allowed to go forward claimed that Jackson National Life Insurance Company aided and abetted a breach of fiduciary duty (Count 2), breach of contract (Count 8), civil conspiracy (Count 9), and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(a), (b), and (c) (Count 15). For clarity, this Court will state the facts as alleged in the instant case.

In the instant case, Plaintiffs sued Jackson, seeking to recoup losses arising out of a fraudulent investment scheme in which Plaintiffs collectively invested and lost $6 million. Jackson has a filed a motion to dismiss all claims against it pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The seven-count amended complaint charges Jackson with negligent misrepresentation (Count 1); aiding and abetting fraudulent misrepresentation and intentional nondisclosure (Count 2); aiding and abetting breach of fiduciary duty (Count 3); aiding and abetting conversion (Count 4); breach of contract (Count 5); civil conspiracy (Count 6); and violation of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) & (d) (Count 7). For the reasons set forth below, the Court will grant in part and deny in part the motion. The motion will be granted as to Counts 1, 2, and 7 and the motion will be denied as to Counts 3, 4, 5, and 6.

## BACKGROUND

The following factual background comes from the allegations in Plaintiffs' complaint and the attached exhibits.[1]

Plaintiffs invested almost $6 million in notes sold by Diversified Lending Group, Inc. (DLG). The notes purportedly guaranteed a nine-percent rate of return ("9% Notes"). In addition to seeking the nine-percent return, Plaintiffs invested in the 9% Notes in reliance on DLG's representations that the notes were reinsured by an "A+ rated national life insurance company," i.e., Jackson. The investment contracts for the 9% Notes contained a "Reinsurance Endorsement," which read in pertinent part:

> When this endorsement is attached and executed by the company and contract owner it will amend the original contract from that of a corporate guarantee to a principal reinsured contract. The Principal amount of the investment will be insured by a AA Rated or better insurance company with the following conditions. The company will issue or cause to issued a "Collateral Assignment" in the principal amount of the contract investment. . . . The owner of the contract will only have the right to call upon this collateral assignment at any time during the contract period if there is an uncured event of default by the company.

(Compl. Ex. 3.)

After Plaintiffs invested their money, DLG claimed to reinsure the contracts. To do this, DLG first bought an annuity from Jackson in the name of Bruce Friedman, DLG's CEO. Then,

---

[1] Although a court is normally precluded from considering matters outside of the pleadings in addressing a motion under Fed. R. Civ. P. 12(b)(6), courts recognize an exception for documents attached to or referenced in the complaint. "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

2

DLG executed a document entitled "Collateral Assignment," which assigned to Plaintiffs DLG's interest in the annuity. (*See* Compl. Ex. 5.) The Collateral Assignment described the annuity assigned as "not more than" the amount of a particular plaintiff's investment. The annuities that Jackson issued to DLG were only ten percent of a plaintiff's investment amount with DLG, and, thus, "not more than" the amount of the plaintiff's investment. For example, the Engelhardts, who invested $300,000.00 with DLG, signed a Collateral Assignment that describes the annuity as "Not more than $300,000.00," even though the annuity had a value of only $30,000.000. (Compl. Ex. 5.) The Collateral Assignments also contained a disclaimer indicating that a copy would be sent to Jackson and that Jackson "assumes no responsibility as to the validity or legal effect of the assignment." (*Id.*)

The complaint alleges that DLG's investment scheme was a Ponzi scheme. DLG did not invest the money as it represented, but rather diverted substantial sums to Friedman's personal use and to ventures unrelated to mortgage loans or income-producing property. DLG also issued fraudulent monthly and quarterly statements, which falsely indicated that the investments were performing as expected and that DLG was profiting. DLG's "reinsurance" of the 9% Notes was fraudulent because the annuities DLG assigned to "reinsure" the notes were worth only ten percent of the total investment amount, but investors were led to believe otherwise due to the language in the Collateral Assignments that the annuity was worth "not more than" the amount of the investor's principal investment. DLG survived only because it obtained money from new investors to pay the withdrawals of prior investors.

The complaint alleges that at the time the Collateral Assignments were issued to Plaintiffs, Jackson knew or should have known that DLG had marketed the assignment as fully reinsuring Plaintiffs' investments, even though the annuities' values were but a fraction of the total

3

investments. In March of 2007, Jackson had sent a cease and desist letter to DLG directing DLG to stop representing that Jackson was affiliated with DLG or to start using a disclaimer in all of its materials that refer to Jackson making clear that Jackson does not reinsure or underwrite DLG's investments. (Am. Compl. Ex. 10.) Even though DLG did not comply with the cease and desist letter, Jackson continued to conduct business with DLG and issue annuities that DLG assigned to investors.

Between 2005 and 2008, Diane Cano was the President of DLG's wholly owned subsidiary, AEI, which serviced, operated, and marketed DLG's products. During this time, Jackson appointed Cano as its agent to solicit and sell Jackson's insurance products and annuities. When Jackson sold annuities to DLG, with Cano as the selling agent, Cano would receive a commission for each sale. Jackson identified Cano as its authorized agent and the person to contact regarding the Collateral Assignments. Moreover, Cano and AEI were identified as the selling agent on each of the approximately 177 annuities sold by Jackson to DLG, which were then collaterally assigned to DLG investors.

During this same time, Jackson employed Kevin Mehlman as a Regional Vice President and a wholesaler of Jackson insurance and annuity products. Plaintiffs allege that Mehlman was Friedman's stepson. During this same time, Plaintiffs also allege that Mehlman ran a business, Your Platinum Distributors, that sold DLG products.

## MOTION STANDARD

The standard for a motion to dismiss is fully set forth in *Ivie*, and will not be repeated.

## ANALYSIS

Count 1: Negligent Misrepresentation

"A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably

4

relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Fejedelem v. Kasco*, 269 Mich. App. 499, 502, 711 N.W.2d 436, 437 (2006) (quoting *Mable Cleary Trust v. Edward-Marlah Muzyl Trust*, 262 Mich. App. 485, 502, 686 N.W.2d 770, 783 (2004)) (internal quotation marks omitted).

### A) No Misrepresentation

The alleged misrepresentations are the statements in the Collateral Assignments that the annuity was worth "not more than" the principal amount invested, when it was actually worth only ten-percent of that amount. This count fails because it does not allege that *Jackson* made a misstatement. The Collateral Assignment itself makes clear that it was "issued" by DLG and merely processed (or accepted) by Jackson. The disclaimer on the face of the assignment explains that a copy will be sent to Jackson and that Jackson assumes no responsibility as to its validity or legal effect. The "not more than" language is not part of the pre-printed form, but rather located within a box to be filled in by the assignor–DLG. Moreover, the letters that Jackson sent to Plaintiffs, which enclosed a copy of the Collateral Assignment, merely explained that Jackson had recently "*received and processed*" the assignments.

Plaintiffs allege that Cano, acting as an agent of Jackson, filled out the Collateral Assignment, and therefore Jackson's agent made the misrepresentation. This statement is belied by the plain statement in the Collateral Assignment which states "[t]he Company assumes no responsibility as to the validity or legal effect of the assignment." This statement subsumes any authority that Cano had to act on Jackson's behalf with regard to making the Collateral Assignments, and therefore was not acting as Jackson's agent.

### B) No Duty

Plaintiffs' negligent misrepresentation count also fails because Jackson did not owe a legal

duty to Plaintiffs.  "[T]he question of whether the defendant owes an actionable legal duty to the plaintiff is one of law which the court decides after assessing the competing policy considerations for and against recognizing such a duty." *In re Certified Question from Fourteenth Dist. Ct. of App. of Tex.*, 479 Mich. 498, 504-05, 740 N.W.2d 206, 210 (2007).  In making the determination, a court considers "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Id.* at 515, 740 N.W.2d at 216.

Plaintiffs and Jackson had a tenuous relationship; DLG was Jackson's client, not Plaintiffs. Assuming Jackson was aware that DLG was representing to clients that the annuity was reinsurance of their entire principal investment when it was actually but a fraction, the foreseeability factor leans in favor of imposing a duty.  Yet, foreseeability is not dispositive of the issue because the "other considerations may be, and usually are, more important." *In re Certified Question*, 479 Mich. at 508, 740 N.W.2d at 212.  Indeed here, the third factor – the burden on the defendant – weighs strongly against imposing a duty.  To do so would mean that every entity whose products may be collaterally assigned would need to ascertain to whom any such assignment was being made and for what purpose, so as to determine whether there is a risk of harm to the assignee.  The Court declines to impose such a duty and finds that Jackson did not owe a duty to Plaintiffs.

Plaintiffs' argument to distinguish this case from *Ivie*, is without merit.  Plaintiffs claim that a duty arises because "Jackson chose to speak."  As discussed above, *Jackson* did not speak.  The disclaimer in the Collateral Assignments – Jackson "assumes no responsibility as to the validity or legal effect of the assignment" – clarifies that Jackson did not make any of the representations in the Collateral Assignments.

> Count 2: Aiding and Abetting Fraudulent Misrepresentation and Intentional Nondisclosure

Fraudulent misrepresentation, or traditional common law fraud, requires that: (1) the

6

defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. *M & D, Inc. v. McConkey*, 231 Mich. App. 22, 27, 585 N.W.2d 33, 36 (1998). Intentional nondisclosure, or fraudulent concealment, or silent fraud, requires a plaintiff to allege that the defendant suppressed a material fact that the defendant had a duty to disclose. *Id.* at 28-29, 585 N.W.2d at 37.

To impose liability as an aider and abettor, Jackson must have had actual knowledge of the tort itself. *Fremont Reorg. Corp. v. Duke*, 2011 WL 4357637, at *17 (E.D. Mich. Sept. 12, 2011) (citing *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 906-07, 910 (W.D. Mich. 2010) and *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006) (holding that a bank's knowledge that its customer was engaged in improper conduct was not sufficient; instead, the plaintiff must show that bank officials "actually knew that the fraud was, in fact, occurring")). A bank's actual knowledge of a fraudulent scheme is the "crucial element" that prevents it from suffering "automatic liability" for the conduct of its customers. *El Camino*, 722 F. Supp. 2d at 908 (citing *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535 (6th Cir. 2000)). "Alleging that the defendant knew or should have known of the illegal scheme is not sufficient." *Fremont*, 2011 WL 4357637, at *17 (quotations omitted).

Count 2 fails because Plaintiffs do not allege that Jackson, or its agent Cano, knew of the fraudulent scheme orchestrated by DLG. Plaintiffs only allege that Jackson knew "DLG was not disclosing to Plaintiffs that the value of the Jackson annuity was only approximately 10%" of the principal investment, (Compl. ¶ 150), and that Jackson knew DLG was making false statements

7

regarding the relationship between DLG and Jackson. (Compl. ¶ 149.) Plaintiffs do not allege, however, that Jackson had knowledge that Plaintiffs were suffering damages as a result of any misrepresentations – that is, that Jackson knew fraud was occurring. Jackson may have thought that, even though DLG was lying about the reinsurance value of Plaintiffs' investments, Plaintiffs were enjoying a nine percent return on their 9% Notes.

In addition, Plaintiffs fail to state a claim for aiding and abetting intentional nondisclosure because Jackson owed no duty to affirmatively act in favor of Plaintiffs. Thus, Jackson cannot be liable for not alerting Plaintiffs that it knew DLG was making false statements.

<u>Count 3: Aiding and Abetting Breach of Fiduciary Duty</u>

A claim of aiding and abetting breach of fiduciary duty requires the plaintiff to allege "(1) breach of a fiduciary duty by a person, (2) the defendant's knowledge and substantial assistance or encouragement of the person's breach of fiduciary duty, and (3) resulting harm." *Gold v. Deloitte & Touche*, 411 B.R. 542, 552 (E.D. Mich. 2009) (citing *L.A. Young Spring & Wire Corp. v. Falls*, 307 Mich. 69, 106-07, 11 N.W.2d 329, 343 (1943); Restatement (Second) of Torts § 876(b) (1979)).

As to the first element, Plaintiffs allege that DLG breach its fiduciary duty by, among other things, misrepresenting the Collateral Assignments as "reinsurance" of Plaintiffs entire principal investments. (Am. Compl. ¶ 158.) As to the second, Plaintiffs allege that Jackson had actual knowledge that DLG was misrepresenting the Collateral Assignments to be reinsurance, vis-a-vis the cease and desist letter, even if not of the full details of the underlying Ponzi scheme. *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 536 (6th Cir. 2000) (explaining that, under Ohio law, although the plaintiff must allege that the aider and abetter had actual knowledge of the primary party's breach, the aider and abetter "need not know all of the details of the primary party's scheme for liability to attach"). Plaintiffs also allege substantial assistance. Absent a duty of

disclosure, which the Court has already found does not exist, Jackson's mere failure to alert Plaintiffs that the annuities were not reinsurance cannot amount to substantial assistance. *See Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541 (W.D. Mich. 1998) (explaining that, under New York Law, absent a confidential or fiduciary relationship giving rise to a duty of disclosure, silence alone cannot be substantial assistance as required of aider or abetter liability); *El Camino Res., LTD v. Huntington Nat'l Bank,* 722 F. Supp. 2d 875, 914 (W.D. Mich. 2010) ("Silence, inaction, or a failure to investigate does not constitute substantial assistance.").

Plaintiffs, however, also allege that Jackson entered into the annuity contracts with DLG and processed the Collateral Assignments, *knowing* that DLG was representing to Plaintiffs that the Collateral Assignments were "reinsurance" for their entire principal investments. Even the supplying of routine services can constitute substantial assistance if done with knowledge that such services are assisting the primary actor's tortious conduct. *See Aetna*, 219 F.3d at 37 (finding the "substantial assistance" element satisfied when a bank issued a four-day loan knowing that it was being used to wrongfully manipulate a construction company's financial position in order to induce the plaintiff-surety to bond the company's construction projects); *El Camino*, 722 F. Supp. 2d at 914 (supplying routine banking services can qualify as substantial assistance where "the bank actually knew that those services were assisting the customer in committing a specific tort"). Finally, as to the last element, although Plaintiffs had already invested in DLG when Jackson issued the annuities and processed their Collateral Assignments, Plaintiffs assert that they relied on the Collateral Assignment in holding onto the 9% Notes. Had Plaintiffs learned that Jackson was not reinsuring the full value of their principal investments, Plaintiffs assert hat they would have withdrawn their investment.

Plaintiffs have sufficiently pled aiding and abetting breach of fiduciary duty (Count 3).

9

Count 4: Aiding and Abetting Conversion

Conversion is the wrongful exercise of dominion over another's personal property. *Attorney General v. Hermes*, 127 Mich. App. 777, 786, 339 N.W.2d 545, 550 (1983). "A person may be liable for conversion by actively aiding or abetting or conniving with another in such an act. Indeed, one may be liable for assisting another in a conversion though acting innocently." *Prime Fin. Servs. LLC v. Vinton*, 279 Mich. App. 245, 276, 761 N.W.2d 694, 714 (2008).

A claim of aiding and abetting conversion requires the plaintiff to allege (1) conversion by a person, (2) the defendant's knowledge and substantial assistance or encouragement of the person's conversion, and (3) resulting harm." *Accord Gold v. Deloitte & Touche*, 411 B.R. 542, 552 (E.D. Mich. 2009) (citing *L.A. Young Spring & Wire Corp. v. Falls*, 307 Mich. 69, 106-07, 11 N.W.2d 329, 343 (1943); Restatement (Second) of Torts § 876(b) (1979)).

As to the first element, the first step is to determine the underlying tort on which the secondary liability is alleged to be based. *See El Camino,* 722 F. Supp. 2d at 914. "Conversion is any distinct act of dominion wrongfully exerted over another's personal property." *Trail Clinic, P.C. v. Bloch*, 114 Mich. App. 700, 705 (1982). Plaintiffs allege that DLG committed conversion by using Plaintiffs' investments in a way that was different from the purpose represented to and intended by Plaintiffs. That is, DLG did not invest in notes while also fully reinsuring their principal value. Plaintiffs sufficiently plead the underlying tort.

As to the second element, Plaintiffs plead that Jackson had knowledge of the conversion. Specifically, Plaintiffs allege that "Jackson had actual knowledge of the scheme imputed to it through its agent Cano and its officer Mehlman." (Am. Compl. ¶ 173.) It does not matter that Jackson did not know what DLG actually did with the money; the unauthorized use of the money is the damage to Plaintiffs. *See Ripley v. Davis*, 15 Mich. 75, 1866 WL 1398, at *3 (1866) (the

10

measure of damages for conversion is the value of the property at the time of conversion). Jackson only needed to know that DLG was not using the investments in the manner that it represented to investors – i.e., fully reinsuring the investment. Plaintiffs have sufficiently pled this portion of the second element.

Not only must Plaintiffs allege that Jackson had the requisite knowledge, but they must also allege that Jackson provided substantial assistance to commit the underlying tort. Absent a duty of disclosure, which the Court has already found did not exist, Jackson's mere failure to alert Plaintiffs that the annuity was not reinsurance cannot amount to substantial assistance. *See Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541; *El Camino,* 722 F. Supp. 2d at 914.

Thus, the question becomes what *affirmative* act Jackson committed that substantially assisted DLG's conversion, which resulted in harm to Plaintiffs. "The plaintiff [must] show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort." *Fremont*, 2011 WL 4357637, at * 18 (E.D. Mich. Sept. 12, 2011) (citing *Aetna*, 219 F.3d at 537 (quoting *K & S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 979 (8th Cir. 1991))). The plaintiff must demonstrate both but-for and proximate causation. *Fremont*, 2011 WL 4357637, at *17 (citing *El Camino*, 722 F. Supp. 2d at 910).

Plaintiffs allege that Jackson sold DLG annuities and processed the Collateral Assignments. Even the supplying of routine services can constitute substantial assistance if done with knowledge that such services are assisting the primary actor's tortious conduct. *See Aetna*, 219 F.3d at 537 (finding the "substantial assistance" element satisfied when a bank issued a four-day loan knowing that it was being used to wrongfully manipulate a construction company's financial position in order to induce the plaint-surety to bond the company's construction projects); *El Camino*, 722 F. Supp. 2d at 914 (supplying routine banking services can qualify as substantial assistance where "the bank

11

actually knew that those services were assisting the customer in committing a specific tort."). By Jackson selling annuities to DLG and processing the Collateral Assignments, it allowed DLG to obtain Plaintiffs' money and then use it in an unauthorized manner; this substantially assisted the conversion. After all, as Friedman said, Jackson was the "800 pound gorilla in this picture."

Furthermore, Plaintiffs allege that this substantial assistance caused them harm. Plaintiffs contend that they would not have invested in the DLG notes had they know that the 9% Notes were not "safe" or "guaranteed." Plaintiffs did invest, however, because, so long as Jackson sold annuities to DLG and processed the Collateral Assignments, DLG could keep obtaining more investors' money and using that money in an unauthorized manner.

Plaintiffs have sufficiently pled aiding and abetting conversion (Count 4).

Count 5: Breach of Contract

To state a claim for breach of contract, the plaintiff must plead the existence of a valid contract, its terms, that the defendant breached the terms of the contract, and that the breach caused the plaintiff's injury. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (applying Michigan law). Count 5 states a claim upon which relief can be granted. The parties do not dispute the existence of valid contracts between Jackson and DLG for annuities, and that Plaintiffs were assigned DLG's rights under those contracts. Additionally, Plaintiffs allege that Jackson refused to pay Plaintiffs the value of the annuities and also that these breaches caused damage to Plaintiffs.

Count 6: Civil Conspiracy

To state a claim for civil conspiracy, the plaintiff must allege "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Temborius v. Slatkin*, 157 Mich. App. 587, 599-600, 403 N.W.2d 821, 827-28 (1986); *see also Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999). A conspiracy requires proof of an intentional agreement. *Temborius*, 157 Mich. App. at 600, 403

N.W.2d at 828.  "Direct proof of agreement is not required, however, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact." *Id.*   Furthermore, conspiracy may be established by circumstantial evidence and may be based on inference. *Id.*  Plaintiffs have sufficiently alleged a cause of action for a civil conspiracy to commit breaches of fiduciary duties.  Plaintiffs allege that Jackson profited by continuing to do business with DLG–issuing annuities and processing the Collateral Assignments of those policies to DLG clients–*knowing* that DLG was misrepresenting the assignments to be reinsurance of the entire principal investment.   These are sufficient allegations to establish an agreement.

Count 7: Violation of RICO

Count 7 alleges that the letters Jackson sent to Plaintiffs "form a pattern of racketeering activity" in the form of mail fraud. (Compl. ¶¶ 202, 209.)[2]  This "racketeering activity," as required by 18 U.S.C. § 1962, is insufficient to state a claim.  As already noted, Jackson did not issue the Collateral Assignments; any representations made in the Collateral Assignments were made by DLG.   Thus, Jackson did not send Plaintiffs any letter which *it* made a misrepresentation.[3] Therefore, the allegations are insufficient to show that Jackson used the mails to further a scheme to defraud Plaintiffs.  *See Walters v. First Tenn. Bank, N.A.*, 855 F.2d 267, 273 (6th Cir. 1988) (holding that mail fraud requires a scheme to defraud and a mailing for the purpose of executing the

---

[2] Plaintiffs withdrew the portion of their RICO claims predicated upon Jackson's contributions to DLG's illegal sales of securities.  Moreover, Plaintiffs do not allege in their complaint or argue in their brief that Jackson violated 18 U.S.C. § 1962(d).

[3] In *Ivie*, this Court let the plaintiff's similar RICO claim survive a motion to dismiss.  However, at the time of ruling on the RICO claim in *Ivie*, this Court did not have an opportunity to analyze the remaining counts.  Importantly, as it is requires dismissal of Plaintiffs' RICO count, this Court had not yet determined that the representations in the Collateral Assignments could not be attributed to Jackson.  Moreover, the letters that Jackson sent to Plaintiffs, which enclosed a copy of the Collateral Assignment, merely explained that Jackson had recently "*received and processed*" the assignments; this is a true statement.

scheme, and the scheme to defraud must involve misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension); *Kotal*, *supra* (Dkt. #22-4 at 4) (making a similar finding as to a RICO claim against Jackson out of its involvement with DLG).

### CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Jackson's motion to dismiss all claims against it. The motion will be granted as to Counts 1, 2, and 7 – for negligent misrepresentation, aiding and abetting fraudulent misrepresentation and intentional nondisclosure, and violation of RICO – which will be dismissed. The motion will be denied as to Counts 3, 4, 5, and 6 – for aiding and abetting breach of fiduciary duty, aiding and abetting conversion, breach of contract, and civil conspiracy.

A separate Order will issue.


Dated: February 2, 2012                               /s/ Gordon J. Quist
                                                     GORDON J. QUIST
                                              UNITED STATES DISTRICT JUDGE